## Stofko v. Stofko, Appellant.

Argued April 15, 1963. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Sidney Baker,* with him *Krause & Baker,* for appellant.

*Francis Taptich,* for appellee.

OPINION BY MONTGOMERY, J., June 12, 1963:

This is an appeal from a decree granting a divorce a.v.m. to husband-appellee on the grounds of indignities.

Our duty in such cases is to examine all the evidence de novo in order to reach an independent conclusion as to whether the allegations of the complaint have been sustained. *Lilley v. Lilley,* 196 Pa. Superior Ct. 261, 175 A. 2d 164. Generally we receive help in reaching our conclusions, especially on the issue of credibility, from the report of the master, if any, and from the adjudication or opinion of the lower court. There was no master in this case and we find little help in that regard from the opinion of the lower court inasmuch as it does not contain any comments on the credibility of the parties or their witnesses, merely recites the testimony without making specific findings based thereon, and concludes that "each (party) is an innocent and injured spouse to some extent", but that "for the good of the plaintiff's health and well-being", it is constrained to grant the relief he seeks.

Although we have decided to review the case without first returning it to the lower court for specific findings, we direct the attention of the lower court to the fact that this Court is not a trial court but one of review.

From the record we make the following findings of fact. Husband-appellee and wife-appellant were married October 30, 1948. Both are of Slavish descent and each had been married previously, the husband's first wife having died in 1946 and the wife's first husband having died in 1942. At the time of their marriage appellee was 61 years of age, had three grown children and was a steelworker for the United States Steel Corporation at its North Braddock mill. In 1954 he was retired and placed on pension after 47 years of faithful service.

At the time of the marriage appellant was 48, did housework and office cleaning to support herself and her two children, then aged 15 and 16. They lived in a house owned by the mother at 557 Corey Avenue in Braddock, which had been bought during the lifetime of her former husband in their joint names, as tenants by the entirety. Appellee also owned a house in Braddock at 227 Lobinger Avenue which at that time he occupied with one of his daughters, Mrs. Mary Pastor, and her family. This daughter vacated these premises shortly after the marriage and resented having to do so, placing the blame on appellant.

Following the marriage, the parties continued to reside in their respective homes for two months until appellee's daughter vacated appellee's home. During this period appellee would take his meals at appellant's home and go to work from there. Appellant also continued to work. Shortly before Christmas, 1948, they moved into his property after having purchased considerable new furniture and furnishings which were necessitated by his daughter's vacation of the premises. Appellant's two daughters lived with them thereafter.

From that time until appellee's retirement in 1954 they lived harmoniously except on one or two occasions. He continued to work and turn over his pay (averaging $150 every two weeks) to her. She paid the bills,

including the payments on the new furnishings, and opened two bank accounts in their joint names in which she eventually accumulated $2,000 in one and $500 in the other. In addition they accumulated fourteen United States $25 E Bonds on payroll deductions. Except for the cashing of two bonds to help pay taxes and a loan of $1,000 to appellee's son, the bonds and accounts were intact as of the date of separation, June 9, 1959. In fact, possession of the two bank books was the cause of their final argument.

The incidents disturbing their harmonious relationship between 1948 and 1954, previously mentioned, were two arrests of appellee on July 14, 1951, and October 22, 1951, for disorderly conduct, and a separation for six months in 1953 when appellant went to stay with her younger daughter living then in Philadelphia. He was discharged at a hearing on the first arrest and fined $10 on the second, which was paid by his wife for him. Both arrests were due to loud and boisterous conduct on his part late at night within the home to the disturbance of the neighbors, which was caused by his drinking. The police were called on both occasions because she could not quiet him. The separation was due to appellee's fighting with and choking appellant and continued until appellee went to Philadelphia to bring her home. On that occasion he stayed a week and became intoxicated, making it necessary for appellant's son-in-law to bring them both back to Braddock.

Appellant's older daughter Margaret lived with them until July, 1953, when she was married and left. The younger sister Mary Ann had been married in June, 1950, and except for a period of six months in 1951, when she returned while expecting a baby, she never lived with them again. However, her two children boarded with appellant and appellee at various times thereafter. Appellee was paid for caring for

them at the rate of five dollars per week each. This arrangement lasted until the final separation in June, 1959.

Following his retirement May 1, 1954, appellee worked occasionally at odd jobs but spent considerable time at the neighborhood tavern. However, his harmonious relationship with his wife did not deteriorate appreciably until about 1957, although there were more arguments between them concerning his late hours and his drinking. On occasions she would deny him admission to the home for these reasons, and the police would again be called.

About 1952 appellant bought another property in her own name, and with appellee joining in the conveyance, transferred it to her daughter Mary Ann. This property was also in Braddock at 333 Lobinger Avenue. The price paid was $9,000, of which she supplied $1,000 of her own money and the balance was the proceeds of an $8,000 loan. Thereafter payments were made on the loan and for taxes from the rental of $66.62 received from the second floor tenant of this property, and from contributions from Mary Ann who occupied the first floor. In July, 1955, appellant sold the Corey Street property for $5,600, and after buying a $400 T.V. set for the home, divided the net proceeds and deposited them in two bank accounts, one in the name of each daughter, since the property had been bought with money supplied by their father. Appellee joined in this deed, although he complains he was to receive one third of the proceeds, but never did.

After his retirement their disputes occurred more frequently. On September 4, 1955, he was arrested again for disorderly conduct on her complaint. She left him again on this occasion and went to North Carolina to stay with her daughter Mary Ann. After several weeks he called and asked her to return. She consented and he sent her money for transportation costs.

On another occasion the police were called because she was missing $65 which she suspected he had taken. However, it was found in one of her coat pockets. Several times the police were called late at night and interceded with her to admit him to the house. The Burgess of Braddock admonished him on one or more occasions. On another occasion he approached her in a belligerent manner while she was working in her kitchen; she defended herself by threatening him with a knife; he then choked her until she dropped the knife, which he picked up and threw out the window.

On December 21, 1957, they argued and he abused her so that she was compelled to go to the Braddock General Hospital for "contusion of the right chest" and she was instructed to return for X ray to determine if she had any broken ribs. She did not do so because after leaving the hospital she found that appellee had removed all of her belongings from their home and placed them in the rain on the porch of her daughter's home. However, after staying with her daughter for six weeks, she again returned to him.

Following this the demands of his children for money became more pressing to the extent that she finally consented to him lending his son $1,000 to buy a house, provided he would return it at the rate of $55 per month as rent. The final episode occurred because of these pressing demands.

On June 9, 1959, he returned home in a belligerent manner and began searching and throwing things about in a way which led her to think he was seeking the bank books. Seeing this, she hid them. An argument and an altercation followed in which he fell down five steps and was injured when he struck a cement walk at the bottom. This resulted in his being taken by the police to the hospital where he was given first aid and released in charge of his daughter. He did not return home again, but two months later had appellant physically evicted.

We have no doubt that many of the words mentioned by appellee as having been directed to him by appellant were spoken, and that he suffered some physical results from her efforts to protect herself in some of the altercations, but his pretense that he was an innocent spouse, or that she is chargeable with cruel and barbarous treatment or of indignities to his person approaches the point of being ridiculous in the light of this record, which contains frank admissions of his use of intoxicants away from as well as within his home, and of the fact that his wife was a good housekeeper, prepared good meals, took care of him and his clothes, and saved his money. Therefore, we conclude that he has not met the burden of proof to entitle him to a divorce.

Decree reversed and complaint in divorce dismissed.